All right. We're done with the regulations. All right. All right. All right. All right. Thank you, Your Honor. May it please the court. In this case, the district court held that sales by defendants that admittedly gave rise to liability one day suddenly changed character the next. The court did so with respect to both willful infringement and the mental state required for induced infringement. We believe the court erred in both regards, and I'd like to talk about each in turn. As to willfulness, in the original case, the district court found that defendants willfully infringed by selling bus converters to Cisco between the December jury verdict and the January 24th entry of the injunction. The court held that was willful infringement. This court affirmed. Defendants Aztec, Belfuse, and Mirada continued to engage in precisely the same kind of sales with precisely the same awareness. There's a two-step right for willfulness. There is a finding of willfulness, and then there is a determination of what additional damages, if any, ought to be incident to that finding of willfulness. Yes, Your Honor. And so if I'm understanding you right, your argument is that to the extent – and you don't say it quite this way, so make sure you agree with me before you agree with me. My understanding of your argument is that the underlying finding of willfulness, a la question about whether they were intentionally manufacturing these products at a time when they knew they shouldn't have, couldn't possibly have been affected by the stay that went into place. Now, that, of course, you recognize doesn't preclude the lower court from saying, okay, fine, another finding of willfulness, but no 1.75 times damages because Judge Ward said at the outset, even though it was dicta, that I wasn't going to award willfulness or additional damages during the stay period, and this judge replicated that statement, and so you realize that if you get what you want, it seems to me you potentially get vacate and remand on that willfulness question, but that doesn't guarantee you by any means the 1.75 times damages because circumstances could be viewed as different in light of Judge Ward's statement, and maybe those additional damages aren't warranted. I believe that's correct, Your Honor. Let me maybe restate it, restate our position, but I don't think there's much space between what you said and what we say. The district court here held as a matter of law that there could not be the willfulness finding, and so it didn't even get to the second part, the enhancement part, and that was the error, and we think that needs to be vacated, and the case needs to be remanded to determine the degree of enhancement. Now, we don't think it should be less than 1.75, but you're certainly correct as a theoretical matter, the court could, in assessing all of the circumstances, including the stay and everything else, decide that it should be something other than 1.75, maybe more, maybe less. Now, the rule that the district court applied on willfulness really has a perverse result when you think about it, because Syncor would have been better off if it had never even bothered to try to get a permanent injunction. So we proved we were entitled to a permanent injunction, irreparable harm, money damages are inadequate. If we had not even sought a permanent injunction and had just sat back and let the defendants continue to rack up sales that we know were willfully infringing, Syncor would have been getting the 1.75, would have been better off than if it had not even bothered to prove that it was entitled to the injunction. That doesn't make any sense. Now, the district court thought that result was compelled by the Amato decision, and that's just incorrect. I'm sorry, Amato addressed the proper calculation of actual damages for post-verdict sales made while an injunction was stayed. Was the amount of damages, has it been briefed in this appeal? I'm sorry, Your Honor? Has it been briefed in this appeal? The amount of damages? No, the amount of actual damages. That's not before us. Right, that has not been disputed, the amount of actual damages that the court awarded for those infringing sales, correct. But that was the issue in Amato, and no one argued in Amato, and the court certainly didn't hold that sales during a stay can never be willful infringement. Now, the court did say, and defendants quote, that willfulness as such is not the inquiry when infringement is permitted pursuant to a court-ordered stay. But that was because the district court in Amato had sua sponte presumed that post-verdict sales were willful infringement when there hadn't been willful infringement before, and  Might the effect of the stay depend on the reason for the stay? Well, if it's on the merits, like indicating a likelihood of success, then it might negate the idea of willfulness and intent, whereas if it was for convenience to review the papers, it might be different. I think I agree with you, Your Honor, and let me say a couple of things. One is I think that as a threshold matter, the fact that a stay had been entered doesn't automatically preclude willfulness under any circumstances. I think it may lead to the kind of inquiry Your Honor was just suggesting. Now, in the Amato case, in fact, there was sort of a whole stay on appeal. Can I ask you for a factual clarification? Sure. Because I thought that part of your answer to Judge Lurie might include the following, but maybe I'm not understanding the facts right. The defendants actually didn't argue any of the three factors for granting a stay except for public interest harm below to the district courts. The district court expressly found they didn't initially argue when they were opposing the permanent injunction and they asked for a stay, they didn't actually dispute the first three factors at all. Well, Your Honor, to be fair, certainly when they came to this court seeking the temporary stay, they did argue… Validity. They argued likelihood of success and validity, correct. Correct. Now, to get back to your question, Judge Lurie, the kind of stay entered here was purely a temporary stay to give this court a chance to consider whether it should enter a stay pending appeal. The court hadn't even heard from Syncor at the time it granted the temporary stay, so to suggest that somehow the fact that, I think it was Judge Lynn who entered the order, was somehow making some sort of a determination about likelihood of success on the merits doesn't make any sense in light of the posture of the case. Then later, when you get to April 11th, when the court fully considered the stay, it denied the stay as to sales to most of the defendant's customers, which also, I think, suggests that this was not a determination that they were likely to prevail on the merits because then you would think the stay would be across the board, which isn't what happened either. But in any event, that didn't happen until April 11th. The sales we're talking about now that were found to infringe but not willfully were in that interim period when it was only a temporary stay. Now, I'd like to turn to the inducement question, and this has to do with the BIN-C red dot labeled sales. Now, we think that in finding no inducement liability for those sales, the district court simply misapplied or misunderstood what the willful blindness standard means for inducement liability. I say that because, really, the material underlying facts are not in dispute. The defendants told this court that Cisco needed to buy their bus converters, and it needed to buy them through September in order to meet its U.S. needs or else, basically, the economy would come crashing down. They testified that they believed it when they said it, they believed it afterwards, and they never changed their belief in what Cisco needed. Now, based on this and the fact that they were indemnified for infringing sales and continued to make those sales, the district court found inducement liability for what I'll call the unlabeled bus converters, but it viewed this red dot system, this BIN-C system, as a completely new fact that changed everything. Well, the court really stated that conclusion, but it never really explained why it changed everything. In fact, it wasn't a new fact, and it didn't change either Cisco's needs or defendants' understanding. But these are facts, and they're based on intent, aren't they? That's a fair point, Your Honor. They are facts, and of course, intent is normally a fact-laden inquiry, and there was a factual determination by the district court here. But to go back to what I started with, the underlying facts, the real operative facts, are not in dispute. It's really this conclusion that the court drew from that. So I think it's more maybe the right way to characterize it as a mixed question of fact and law, where the court was... We know about those. I know that you know very well about those, Your Honor. So basically, the court took facts that really, the underlying facts aren't disputed, and drew essentially a legal conclusion from them, and we think that's where the court went astray. Now, the reason that the red dot system didn't change anything is because, first of all, Cisco had developed it well in advance of the injunction being entered. The defendants knew about it when they were telling this court that Cisco has to buy our bus converters or it's going to go crashing down. Two of the defendants, Aztec and Power One, were already using the system. At the time they were telling this court, Cisco has to buy from us through September. So basically, their statements to this court, which they said they continued to believe, assumed that red stickers were going to be put on these bus converters at some point. Cisco never told them its needs had changed, and they never asked. Now, whether they didn't ask because they didn't want to know the answer, because it would confirm what they strongly suspected, or because they didn't care, because they were being indemnified for everything, including enhanced damages. Either way, it doesn't matter, because what it means is that this red dot system was just a smokescreen, something that could give them plausible deniability. It was not really designed to prevent continued infringement. Intent again. Intent again, Your Honor. Fair point. Now, the defendants point to Syncor and Ericsson as being possible sources of supply. That's direct evidence of intent, correct? I mean, the bin process and putting the red dots on these converters, these are actions that are taken that recognizes the infringing sales. So what evidence are you arguing? Circumstantial evidence? Well, here's what we're pointing to, Your Honor. We're pointing to what the defendants told this court, what they testified they believed when they said it, and continue to believe throughout the period at issue, and that is that Cisco absolutely had to have their bus converters or else it would default on all its U.S. obligations. The fact that they never asked Cisco. So forget about the stay and all of that for a minute and what they told this court. You're a businessman. You thought your biggest customer absolutely had to have your bus converters for this period of time for its U.S. sales, and then suddenly it seems, well, they don't need your bus converters. You don't even ask, well, what happened? How come you don't need me anymore? That's what I think points to the willful blindness here, Your Honor. The red dots were not direct evidence of intent when you view them in the context of everything else that was going on, which are the representations, the understandings, and the continued sales. And for several of these defendants, substantially increased sales during the same period when they said that Cisco, which brings half of it, 50 percent of its products into the U.S. So it seems like you were asking us to infer intent from the defendants' follow-up on that they failed to follow up with the BNC process. So I understand your argument. I'm just wondering what kind of evidence did you put forth to show that goes to the intent argument? Well, here's what we have, Your Honor. Defendants knew that Cisco needed their bus converters through September. No, defendants knew that Cisco needed bus converters. No, no, Your Honor. And I'm glad you said that. This is not a single supplier case, which is why you don't win on this point. It's not a single supplier case. You've got a million different people all supplying Cisco. And I believe I'm red dotting and I'm yellow sticker labeling every box. And you know what? I think that we're all good and you're not sending mine to the U.S. because you're not supposed to. I mean, this is intent, like Judge Lori said. How is that not good enough in a multi-supplier scenario? Here's why it's not good enough, Your Honor. Because each of the defendants told that these things are not fungible because they have to be qualified for particular Cisco end products. So even if they look the same, they have to go through a rigorous testing process, and their briefs are full of how rigorous that process is. ASTEC told this court, this is at A-10-763, an injunction that disrupts the supply of the products ASTEC supplies to Cisco will have all these horrible consequences. There will be harm to the 10-770. Harm to the public if Cisco were precluded from obtaining the parts it needs from ASTEC. That was at the time of the injunction. And they testified that they continued to believe that throughout the relevant period, all the way to September. So that didn't change. So it's not, I hear what you're saying, Your Honor. It isn't that, oh, well, ASTEC thought they were getting them from Belfuse, and Belfuse thought they were getting them from Urata. They all told this court, Cisco needs our parts, specifically. And two of them, ASTEC and Belfuse, in their stay request, listed all the specific part numbers that Cisco had to get and could only get from them. So it is a multi-supplier case, but it's a multi, I would submit it's a multi-supplier case where they're siloed, and they have to be the source of supply for particular parts. So we have your attorney arguments with respect to those statements that were made, but we've got direct evidence that the defendants took steps to avoid infringement. And the court considered that, did consider the BNC process, the red dot process, and the other actions. Direct evidence of their activity that they took to avoid infringement. Well, the only activity that they even point to as to avoid infringement is putting these red stickers on there at a time when their stated intent was notwithstanding these red stickers, we know that Cisco still needs our parts through September. So I think the direct evidence of intent is actually the other way, and that what you have here is direct evidence of, as I said, a smoke screen designed to manufacture deniability, which is the definition of willful blindness. Mr. Trella, as you see, you've consumed your time. We'll give you five minutes of rebuttal time back, and let's hear from the three appellees. Thank you, Your Honor. Mr. Berliner, you're representing Apollo 1. Yes, Your Honor. Five minutes. May it please the court. You had a summary judgment. Yes, Your Honor. It has long been the law of this court and its predecessor courts that a U.S. patent has no extraterritorial effect. And by that, I mean that a U.S. patent cannot be used to prevent legitimate business activity, including the sales of a product outside of the United States. But that is exactly what CINCOR is attempting to achieve here in this appeal. While CINCOR frames its infringement argument in – address them at all on reply. You realize that, right? That's the way this works. By standing up and talking, you've now opened the door for him to address these issues on reply when he didn't have that option. If you had deferred your time to the other two, they could have kept him out of all of this. Well, thank you, Your Honor. It's undisputed here that Power I complied with the terms of the permanent injunction. It never availed itself of the stays ordered by the district court or by this court. And it instituted additional protections against importation. Counsel has talked about the red dot, but that wasn't all that Power I did. Doesn't your point lack a genuine issue, material fact, defending summary judgment? Yes, Your Honor. And here, there's no evidence in the record of intent, as has been pointed out. Now, counsel has focused a lot on the arguments in the stay briefing, and I'd like to direct my attention to those. First of all, Power I never availed itself of the stays. It joined the motions for stay in order to keep its legal options open, but at the end of the day, it never availed itself. It never took advantage of the stays. It always complied with the injunction, and it implemented additional protections in terms of getting the agreement by Cisco to not import. As Judge Moore pointed out, this is a multi-supplier market. Every supplier knows only what it sells to Cisco. It doesn't know what the other suppliers are providing. It doesn't know Cisco's overall demand. And because Power I had these protections in place, it was reasonable for Power I to believe that its components would go for the overseas markets and that other suppliers would supply the U.S. market. Syncor told this court that it could supply two-thirds of Cisco's needs, so we were reasonable in relying upon that. At most, what... And is it true you never had an indemnification agreement? Is that right? We did not. That is true. Power I believed that because it was implementing these procedures and it had Cisco's agreement to not import that, that we were... An indemnification agreement was unnecessary. Correct, not in writing. That's correct, but that fact is undisputed in the record. So what... Undisputed, that you didn't have one or that one was offered and you didn't take it? Syncor argues that there was no written agreement, but it hasn't presented any evidence that there wasn't an oral agreement. Those facts are undisputed. They've tried to speculate that because there's no written agreement that there was some breakdown or some dispute over that, but there's no evidence in the record of that. The undisputed evidence is that there was an oral agreement. The last thing I'd mention is that if we look at the information in the state briefing that counsel keeps referring to, at most, it shows that there was a possibility of infringement, and this court has said that that's enough. In fact, Judge Lurie, in the Warner-Lambert case, you said that mere knowledge of possible infringement by others does not amount to inducement. Specific intent and action to induce infringement must be proven. In this case, Power One took all actions possible and reasonably practical to avoid infringement, and that just simply shows that they were not actively inducing infringement. I'm not sure where I am on time, but if there's no further questions, I'll pass the mic. Thank you, Mr. Verlina. Mr. Roquin is next with eight minutes. We might let you run over a little bit of his questioning, but please proceed. Thank you, Judge Lurie, and may it please the Court, John O'Quinn on behalf of Murata, Belfuse, and Aztec. I'd like to start briefly on the issue of inducement. Sincor's claim that these defendants actively induced after April 11, 2011, and with respect to Aztec for a limited period before April 11, 2011, was thoroughly vetted during the four-day bench trial. Why don't you move on to the willfulness? I'd be happy to judge more. With respect to willfulness, and this only applies to the pre-April 11, 2011, sales, the Court concluded that sales intended for U.S. use while the injunction was fully stayed were not reckless acts of infringement. Let's be clear about what the circumstances were. This is not a case where a jury found that there had been willful infringement. Sincor took the issue of willfulness off the table in order to keep out from the jury what was going on in the re-examinations, re-examinations in which subsequently the examiner found that every single one of the asserted claims was invalid. Now, those decisions were – at least some of them have been reversed by the PTAB, and some of them are currently on appeal to this Court, and this Court heard argument in Vicor v. Sincor last month. But the jury didn't make a finding of willfulness. In fact, there was no finding of willfulness prior to any of these sales taking place. Yes, but once a verdict was rendered, finding you to be infringing and finding the patents valid as against all the defenses raised, I think the district court at that point said your continued sales after the verdict are in fact willful. Well, Judge Moore, respectfully, the district court actually didn't do that analysis. In fact, if you look at the district court's opinion in Sincor 1 – and that's not before the Court, I understand – but there's no finding that the defendant's defenses are objectively unreasonable as required by Seagate and by Bard 2. Well, why did she have to do that post-verdict? Why, after the verdict has been rendered, does he need to make a finding? The jury already made that finding. Well, Judge Moore, the jury made a finding, but there were post-trial motions that were pending. There was an appeal that was pending. I mean is the court really going to take the position that any time there has been a jury verdict, any further acts of infringement are in peril of being willful even though they may very well be reversed by this court? And in fact, that's the significance of the state. What's wrong with that position? You're saying it as though it's the sky is falling, and I'm saying fall, sky, fall. I don't get it. What is the harm associated with what you just said? I don't see the problem. Once a jury has adjudicated you to be an infringer and the patent to be valid, why isn't every sale you make after that day potentially a willful infringing sale and potentially liable for exceptional damages? Well, Judge Moore, I mean to be sure, every sale is potentially, just like every sale potentially before the jury's verdict was as well. Of course, in this case, Wolf and I had been taken off the table, so there is that inconsistency. We're not talking about pre-verdict. We're talking about post-verdict. But post-verdict. What do you know? The patent's valid and infringed. But you don't know that, Judge Moore. I'm pretty sure you did. A jury just told you it was. And this court reverses jury verdicts with some frequency. So you think defendants should have a compulsory license at pre-verdict rates regardless of the fact that a jury has now come along and awarded damages and infringement and oh my goodness sake. Judge Moore, that's not at all our position, and that's not the position that this court took in Amato. And Amato made clear that when you're talking about supplemental damages, and that's what we're talking about here. We're not talking about a follow-on case where the issue's been put in front of the jury. When you're talking about supplemental damages, willfulness as such is not the inquiry. And in fact – No, willfulness is not – what your district court did wrong in Amato was they simply said, well, we're going to use the willful infringement. Boom, there is an automatic award. And what Judge Flynn and this court did in that case was to actually articulate, no, here's all the factors you're supposed to be looking at. Here's the kind of stuff you're supposed to do. And isn't that what the district court did in this case at 57-691 and 692 when the district court issued its order in which it decided to enhance by 1.75 times the damage award? In fact, I would like to draw your attention to the precise reasons that the district court gave for doing that. I'll give you a sec to find it. I'm sorry, which page you're on? 57-691 and 57-692. This is where the lower court decided that the 1.75 times enhancement for supplemental damages was appropriate. That's what we're arguing about now, whether it ceased to be appropriate the day of the stay or whether it continued to be appropriate. But what were the reasons he gave this district court judge for enhancing the damages by 1.75 percent? You tell me. What were the reasons he gave? Judge Moore, the only – the reasons that he gave is he said that the defendants did not cease the sales of these products that had been found to infringe but continued to sell these products. I remember what he said. This not only had the effect of rendering Syncor's exclusive rights meaningless but also deprived Syncor of the opportunity to develop goodwill with its customers and brand recognition of its products. Isn't that exactly the kind of thing that we said in Amato is what you should consider? It sounds compensatory. It doesn't even sound punitive. It sounds to me like this guy found that a compulsory license at a higher rate was warranted post-verdict. So Judge Moore, I think you're conflating a couple things. First of all, that's not what he was doing. If it had been, it would be a different inquiry because what this court on appeals did – I just read the opinion. How can you say that's not what he was doing? Which part that I read is not right? Judge Moore, there wasn't an – or if you look back at the Syncor 1 decision of this court on appeals, the question was whether or not this was enhancement under 284 not because of changed circumstances but because it was willful behavior. And I would agree with you if what the district court had done originally was simply say, look, for this period of time, I found that there are these changed circumstances. And the district court looked at changed circumstances here too, I might add. That's at A29 – A24 and A19. The court finds that this post-verdict conduct of these defendants was intended to and did actually harm Syncor. And Judge Moore – But moral damages should be enhanced by 1.75 times. So he's either doing one of two things. He's either – and this is Judge Ward in the original opinion. He's either going through and saying I'm taking into account changed circumstances, or he's going through and making a willfulness inquiry without taking into account what the objective reasonableness of the defenses were and whether they were still objectively reasonable on appeal. Now, he's either doing one or the other. How about appeal? How could they be objectively reasonable on appeal? He's deciding what you're doing the minutes after the verdict is rendered. There is no appeal at that point in time, and he had no reason to think you're going to appeal. Well, he knows that – Judge Moore, first, that's not true. The time this opinion came down, appeal was pending. This is August of 2011. This is after all of the sales that are at issue in this case have already been made. This is after all of that. That's when this opinion happened, August of 2011. And the fact that a stay by this court was granted pending appeal is significant for two things. You have defendants here who are not behaving recklessly. They are playing by the rules. That is, you have – an injunction is entered, and these – and there's testimony of this. These defendants stopped making sales. You can see it at A9932 and A57573. They stopped making sales. And then when the stay was granted, they resumed making sales. The significance of the stay having been granted is twofold. Number one, it's important as a matter of public policy. This court is, in the words of Amato, granting its imprimatur to those sales taking place. That doesn't mean that they're not going to have to be compensatory, and it doesn't mean that the district court can't take into effect other factors, like the changed circumstances, in making a compensatory award. And the district court here did that. If you look at A19 and A24, the district court in this case took into account the changed circumstances in doing the compensatory award. But it would be bizarre for this court to have one panel with its imprimatur to say the injunction has stayed, sales may proceed, and for another panel to come back later and say, and those sales are going to be willful. And it would be bizarre for two reasons. Number one, it would thwart the purpose of having granted a stay in the first place. The whole point of a stay was so that sales could occur to prevent harm. The whole point of a stay is to maintain status quo. Status quo prior to the stay was that they were receiving 275% 1.75 enhancement, a regular damage award, on every single one. That was not the status quo, Judge Moore. Now, respectfully, his enhancement occurred after the stay was granted. Again, the timeline here is important. And respectfully, I think you're not understanding the timeline. All of these things, the only decision with respect to enhancement and the decision that they would receive 2.75 happened in August of 2011. The stay was granted originally in January of 2011 and then subsequently in April of 2011. This court modified it. It specifically recited all of the factors required for a stay. It identified likelihood of success on the merits as being one of the, quote, critical factors and consistent with Barred 2. But a stay shouldn't automatically negate willfulness. Shouldn't it depend upon the reason for the stay? Well, Judge Laurie, respectfully, if the court's following the standard that the Supreme Court set out in Ken v. Holder, one of the factors that the court is going to always have to consider in granting a stay is likelihood of success on the merits. And there has to be some finding of likelihood of success. That was not the reason for the stay here. Well, Judge Laurie, respectfully, if you look in August – excuse me, if you look at the April 11, 2011 decision modifying the stay, the court recites the stay standard, identifies likelihood of success on the merits as one of the two, quote, critical factors for granting a stay. Which weren't evaluated here. Which was evaluated in this case, Your Honor. The parties had specifically argued about likelihood of success on the merits. That's not what the judge said as a reason for finding lack of willfulness. Well, I'm sorry. You mean this court? This court. No, the district court whose decision we're reviewing. Oh, no. The district court found that the fact that the stay had been granted and the fact that the stay had been granted. They had willfulness. Well, there were a couple reasons for it. One is that you have the granting of the imprimatur, the fact that it's a matter of public policy to say we want these sales to continue, but to then say not just that you can't be compensated for them. Of course they can be compensated for them, that you're going to be punished for it. But second, that you have the finding by this court of finding that there's at least some likelihood of success on the merits. You have objective reasonableness. And, of course, under this court's precedent in Bard II, that is Bard v. Gore II, the question of objective reasonableness is a question of law that's reviewed by this court. And when you look at the totality of the circumstances here, whether you agree with the specific reasoning that the district court used in this case or not, there's no need to remand the issue of willfulness. When you look and take everything into account, you can't say that these defendants were objectively – But the district court based its decision on its reading of Amato. Is that reading correct? Didn't the court read Amato too narrowly in this situation as limited only to willfulness and no consideration of other circumstances? So, Judge Reina, I think that the district court's reading of Amato as applied to the facts of this case is correct. And the reason is because Amato looks just like this case. It isn't a situation where you have a jury determination of willfulness, and someone's continuing to make sales in the face of that. What you had in Amato was a calculation of supplemental damages, and that's what you have at issue in this case as well, supplemental damages. And Amato, I think, instructs that you're not supposed to ask the question about whether or not it was, quote, willful. But you are to take into account – Right, but willfulness is not the inquiry. That's right. Willfulness is not the inquiry. You are to take into account changed circumstances. You can take into account – Where do we see that the court did that? You can see that in two places in the record, Your Honor. You can see it at A19. That's where the district court recites Amato for that proposition that he's supposed to take into account changed circumstances. And you can see it, if I remember correctly, at A24. And A24, the district court in this case, in determining compensatory damages, in determining what the rate should be. Thank you, Mr. O'Quinn. We've given you a good deal of extra time. Thank you, Justice Lurie. And you can hear from Mr. Deba. And you have two minutes. Your Honor, in light of the fact – Two minutes effectively. Yes, sir. Thank you. In light of Appellant not raising any issues on Juniper, I will pass my time. All right. Thank you very much, Mr. Trello. We'll give you five minutes to respond. Thank you, Your Honor. Let me touch on willfulness very briefly. Mr. O'Quinn said the timeline is very important, and I agree with him, but I think it's Mr. O'Quinn who's confused about the timeline. What matters is the conduct that was at issue. Between the jury verdict and the injunction, that conduct was willful infringement. We know that. This Court affirmed that. Much of what Mr. O'Quinn had to say was basically re-arguing the willfulness determination from the first case. That's gone, and that's not on the table. Now, this Court – and he was also confused about the timeline of the stays. The stay that matters for purposes of the District Court's willfulness determination was a temporary stay entered in January without hearing from Syncor, simply to allow the Court to fully consider whether it should stay the case pending appeal. Whatever happened on April 11th certainly didn't affect the defendant's mindset because these sales we're talking about right now all occurred before April 11th, and moreover – But what about the Federal Circuit's emergency stay? The District Court didn't continue until April 11th. Right, and that's the stay I was talking about. That was without hearing from Syncor, and that was simply and expressly to allow the Court to fully consider whether a stay should be entered pending appeal. And that was purely to preserve the status quo, to give the Court enough time. Remember, the defendants came in on emergency motions, saying that the world was going to come to an end if they couldn't keep selling these bus converters. So this was simply – I think it's just incorrect to suggest there was any assessment of the merits. The Federal Government was going to shut down all the courts. The military. The Navy shift. Exactly. Hospitals were going to shut down. Despite the fact that the government was free to infringe. Exactly. Anyway, enough said on willfulness. The door having been opened, it would be rude for me not to go through it on Power One. And I think the Power One summary judgment really underscores the District Court's misunderstanding of willful blindness. Power One, like the other defendants, told the Court that Cisco needed to buy its bus converters through September for U.S. use. Power One testified it believed that. Cisco never told it anything different. Now the Court focused and counsel focused on two things. One is the supposed oral non-importation agreement. Now even if that agreement existed, it doesn't change anything because on Power One's version of the facts, that agreement was already in place at the same time it was telling this court that it absolutely had to keep selling to Cisco for Cisco to use its bus converters in the United States. There was nothing equivocal about it. It wasn't, you know, gee, Federal Circuit, we're just preserving our options. It was Cisco needs to buy from us, notwithstanding this non-importation agreement, which supposedly was in place already by February 1st. The other factor that counsel and the District Court focused on was the supposed lack of an indemnification agreement. First of all, even if that's true, all that means is that there's one less additional fact showing intent. It doesn't erase the other evidence of intent. And it's not an undisputed fact. The facts are, the evidence is, Power One said it would not ship to Cisco without an indemnification agreement. Cisco said, fine, send them a proposed written indemnification agreement. After that, Power One starts shipping again. And the witness they put on to say, oh, well, we didn't have an indemnification agreement with Cisco, also disclaimed any knowledge about the actual discussions with Cisco and, you know, basically pointed to somebody else who was not offered as a witness on this issue. In their red brief on page 22, you don't need to pull it out. I'll just tell you what it says. Power One does say that Syncor has admitted, quote, the bus converters bracketed Power One cells are fungible commodities. So why doesn't this play into the question I asked you in the very beginning about a multiplayer market where each individual doesn't necessarily know it's theirs that are going to the U.S.? The reason is because that quote was taken way out of context. And, in fact, and the record is quite clear on this, particular bus converters have to be qualified by Cisco even if they are very similar. They go through a month-long qualification process for Cisco to be put in particular Cisco products. And Power One bus converters were approved for particular Cisco products. Although physically later it may turn out that they're fungible, they were not fungible during this qualification period, and that's what we're talking about here. And the other fact that I'm running out of time. Even if bus converters have to meet certain specifications, it doesn't mean that you don't have a multiplayer market that can meet those specifications. It means that during the period at issue here, which is, Cisco said it would take at least until September to qualify. This isn't that new bus converters would have to be developed. These are existing bus converters, but it would take them until then to qualify them. So you're right, Your Honor, but during the time period we're talking about here, it's the same as they're not being available. I will not abuse the court by using more than you've given me. We appreciate that. Thank you. Thank you, Mr. Patello. The case will be taken under advisement.